UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOROTHY HENSMAN,

                    Plaintiff,                         No. 06-CV-14756-DT

vs.                                                    Hon. Gerald E. Rosen

CITY OF RIVERVIEW,

                    Defendant.
_____/

CORRECTED OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

                 At a session of said Court, held in
                 the U.S. Courthouse, Detroit, Michigan
                 on    March 26, 2008

                 PRESENT:   Honorable Gerald E. Rosen
                                United States District Judge

I. INTRODUCTION

        This Title VII/Elliott-Larsen sexual harassment/hostile work environment case is

presently before the Court on the Motion for Summary Judgment filed by the Defendant,

the City of Riverview, Michigan.  Plaintiff has responded to Defendant's Motion and

Defendant has replied.  Having reviewed and considered the parties' briefs and

supporting evidence, the Court determined that oral argument is not necessary.

_____

        [1]  The Court enters this Corrected Opinion and Order pursuant to Fed. R. Civ. P.
60(a) to correct a clerical mistake noted in the original March 21, 2008 Opinion.  This
correction does not change the substance of the Court's ruling.

1

Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Dorothy ("Dodie") Hensman is a former employee of the City of Riverview, Michigan. Ms. Hensman was hired by the Riverview Fire Department in 1995 as a permanent part-time dispatcher/clerk. She worked 30 hours per week -- six hours per day (6:00 a.m.- 12:00 noon) five days a week until she left her employment on November 2, 2005. She began a medical "stress leave" on November 3, 2005 and has not returned to the Fire Department since that time.

As the title "dispatcher/clerk" suggests, Ms. Hensman job entailed both dispatch and clerical duties. Approximately fifty percent of Plaintiff's work was devoted to dispatch and fifty percent was clerical. [*See* Timothy Bosman Dep., p. 8]. Plaintiff's responsibilities in dispatch included handling radio communications and dispatching emergency vehicles to calls. Her clerical duties included preparing ambulance billings, handling purchase orders and maintaining records on purchase matters; typing personnel action forms ("PAFs"); preparing memos and performing other clerical duties for the fire chief; and performing payroll functions. [*See id.*, pp. 6-8.]

Plaintiff's immediate supervisor at the Fire Department was the Fire Marshal/Deputy Chief, Timothy Bosman. Plaintiff testified that she and Bosman had been high school classmates and she considered him her friend. [*See* Plaintiff's Dep., p.

10.]  Both Hensman and Bosman reported to the Fire Chief.  Until September 19, 2005,

the Riverview Fire Chief was Robert Hale.  Chief Hale retired in September 2005.  Hale

was replaced by Richard Batchelder.[2]

Batchelder came to Riverview after 25 years of service with the Shelby Township

Fire Department.  Although Plaintiff testified that she had no complaints about the former

chief, Chief Hale, Plaintiff did not think very highly of Hale's successor, Richard

Batchelder.  She found Batchelder to be "a pretty crummy chief," a "fish out of water"

who could not fill a fire chief's boots. [*See* Plaintiff's Dep., p. 40.]   In her opinion, it was

unprofessional for Batchelder to ask the city manager or the human resources director for

help, *id.* at 39-40, and to eat lunch and dinner or otherwise socialize with the firefighters

in their day room -- "it's always been a procedure not to commingle with staff."  *Id.* at

38.  She thought that Chief Batchelder was a "buffoon," a "joke with the other fire

chiefs," that "he didn't know what he was doing," that "he didn't understand accounts,"

"didn't understand the budgeting [or] the purchasing process," and would "not listen to

her" when she tried to assist him in understanding his responsibilities. [*See* Bosman Dep.,

p. 16; Denise Kuch Dep., pp. 13, 27-28.]  In short, she found him to be lazy and

incompetent, and resented his foisting extra work on her -- work that she believed was his

responsibility. [*See e.g.,* Plaintiff's Dep., pp.  22-23, 38-40.]

---

[2]  Batchelder left his job as Riverview's Fire Chief in August 2006.  Timothy
Bosman, who was the Fire Marshal at the time of the events at issue in this action, is now
the Fire Chief.

As indicated above, Plaintiff worked under Chief Batchelder for approximately six weeks -- from September 19, 2005 when Batchelder took over as Fire Chief until she left her employment on November 2, 2005. According to Plaintiff, Batchelder's actions during that short time period were sexually harassing and created a sexually hostile work environment making her job at the Riverview Fire Department no longer tolerable. Plaintiff admits, however, that Batchelder never asked Plaintiff out on a date, never propositioned her sexually in any way, never demanded any sexual favors of her and never sexually groped or fondled her. The only "physical touching" Plaintiff complains of is that on three occasions, Batchelder hugged her.[3]

According to Plaintiff, the first time Batchelder hugged her was some time during the first two weeks of his employment. She testified that Batchelder "put his arms around [her]. . . and said, 'Thank you for helping me so much with the transition of starting a new job.'" [Plaintiff's Dep., pp. 16-17]. The second time was the beginning of the next week when Batchelder told her, "You're beautiful. I couldn't do this job without you, you are the backbone of this building. I can see you are a very important part of the operation running smoothly and I'm very thankful to have you." [Plaintiff's Dep. p. 19.]

Plaintiff testified that she never told Batchelder that she did not want him to hug her because he had just started on the job and she wanted to give him the benefit of the doubt to allow him to get acclimated with the fire department. *Id.* at 20. She added that

---

[3] Batchelder testified that he recalled hugging Plaintiff once. Timothy Bosman testified that he saw Batchelder hug Plaintiff twice.

she worked with 55 men and has a "high tolerance." *Id.*[4]

The third hug was a month later, the day before Plaintiff left her job. Plaintiff testified that on November 1, 2005, Batchelder called her into his office and said that he had sensed a tension between them. According to Plaintiff, Batchelder said, "I don't want you to be mad at me and I can tell something is up. I want you to tell me what's the matter" because "I want us to have a close working relationship, [like] a marriage, if you will." *Id*. at 82-83. Plaintiff testified that she asked him if he was sure he wanted to hear what she had to say because she did not think he could handle hearing the truth. *Id.* After Batchelder said he wanted to hear what she had to say, Plaintiff proceeded to tell him that

> I found him to be stepping over boundaries personally and professionally, that he gave me all of his work to do plus I had my [own] work to do, that I thought he was irritating in the manner he did it, [that] I thought he was a perfect example of someone with ADD because he's all over the place, and that it was very difficult for me to perform my job because he was constantly interrupting with compliments and personal statements about me, [and] I didn't have the emotional wherewithal to deal with it anymore.

[Plaintiff's Dep. pp. 83-84.]

According to Plaintiff, after she finished, Batchelder apologized and said he was sorry. Then, as she left his office, Batchelder followed her to her desk and, saying he did not want her to be mad at him anymore, he hugged her. *Id.* 86. Batchelder admits he hugged Plaintiff on November 1 "trying to calm her down [because] she was upset [and]

---

[4] Timothy Bosman, in fact, testified that Plaintiff herself hugged various men in the department "in a friendly manner." [Bosman Dep., pp. 29-30; *see also* Hajkus Affidavit, Ex. 7(B).]

emotional." [Batchelder Dep., p. 95.]

Plaintiff also complains that for the first month of his employment, Batchelder frequently called her by the wrong name. *Id.* at 27. According to Plaintiff -- who is known as "Dodie" to her friends and her former co-workers -- Batchelder would call her, "Dorothy" (which is Plaintiff's given name), "Jodie," "Mrs. Henson," "Mrs. Hendman,"or "Debbie." *Id.*[5] Plaintiff contends that calling her by an incorrect name was annoying and constitutes sexual harassment. *Id.* at 27. *See also* Defendant's Ex. 3; Plaintiff's Supplemental Brief Ex.1.[6]

Plaintiff also claims that she was sexually harassed by Batchelder because when he would call her into his office, he would close the door. *Id.* at 68-69. According to Timothy Bosman, Plaintiff complained to him that being in the office with Batchelder with the door closed made her feel uncomfortable. [Bosman Dep., p. 22]. However, Bosman testified that that was Batchelder's practice with everybody, adding, "We were used to an open door policy prior to him." [Bosman Dep., p. 22.]

Plaintiff also complains that Batchelder walked too closely behind her -- so closely that she "didn't dare stop or we would have had a physical collision." [Plaintiff's Dep. pp.

---

[5] Batchelder admitted that he did sometimes mistakenly call Plaintiff "Jodie." He testified, "I probably did it several times. I had 50 names to remember. I was new to the job and if I caught myself doing it I would correct myself and apologize," adding that he sometimes called his own children by the wrong names. *See* Batchelder Dep., p. 98; *see also* Defendant's Ex. 3.

[6] The Court grants Plaintiff's Motion for Leave to File a Supplemental Brief and accepts as filed the Brief tendered on November 2, 2007.

14, 28.]

She also claims that Batchelder complimenting her work performance and appearance constituted sexual harassment. *See id.*, p. 14. Specifically, she complains about one incident on October 11, 2005 when she spoke to Batchelder about having to do work that she believed was his responsibility. She claims that when she finished speaking, Batchelder told her he had not been listening because he was distracted by her beautiful eyes. *Id.* at 28. She also claims that Batchelder asking her what fragrance she was wearing and telling her she smelled nice constituted harassment, adding that she could hear him "sniffing." *Id.* at 60, 72.

The only "sexual" compliment Plaintiff complains of allegedly occurred in the context of Batchelder talking about his wife and mother-in-law. Plaintiff claims that Batchelder told her that she was a strong, aggressive, "voluptuous," "well-endowed" woman, like his wife and mother-in-law, who could control situations. *Id.* at 59, 67. She also contends that when he said the word "voluptuous" in this conversation, he made a hand gesture like "what men do when women have large breasts." *Id.* at 59. According to Plaintiff, there were two conversations in which Batchelder referred to her as "voluptuous." *Id.*[7]

Another incident which Plaintiff claims constituted sexual harassment occurred the

_____

[7] Batchelder denies making any such gesture and denies calling Plaintiff "well-endowed" or "voluptuous," adding, "That's a word that's not in my vocabulary." Batchelder Dep., pp. 86-88.

evening of October 25, 2005.   On that date, Batchelder had an evening meeting with the

union president and, when he left the fire station to go to the meeting, he mistakenly

locked his office, truck and apartment keys in the office.  Since Plaintiff was the only

other person who had an office key, he called her at home at approximately 11:30 p.m.

and asked if she would come to the station and bring her office key so he could get in.  *Id*.

at 75; *see also* Batchelder Dep., pp. 81-82.  Plaintiff told him she would not come to the

station and that if he wanted the key he would have to come to her house and get it.

[Plaintiff's Dep. pp. 75-76.]   Batchelder did go to Plaintiff's house and Plaintiff,

accompanied by her husband and daughter, answered the door wearing a bathrobe.  *Id.* at

76.  According to Plaintiff, Batchelder apologized for bothering her and her family and as

she handed him the key, Batchelder commented, "You look cute in your jammies; I can

see what you looked like as a little girl with your messy hair."  *Id.*   The next day,

Batchelder came to the office and brought her a bouquet of flowers bagels for breakfast

and apologized again for bothering her the night before and for saying she looked cute in

her jammies.  *Id.*  Plaintiff testified that she was "humiliated" because the firefighters

thought it was funny that Batchelder had woken her up in the middle of the night.  *Id.* at

77-79.  "Everyone thought it was real funny."  *Id.* at 79.

Apparently, it was following this incident that Batchelder discerned a tension in

dealing with Ms. Hensman which precipitated his asking her on November 1 what was

bothering her.  As indicated above, Plaintiff responded to Batchelder's inquiry and on

November 1, 2005, told him that she did not appreciate him giving her all of his work to

do, that she found him irritating and that she thought he was the "perfect example of someone with ADD because he's all over the place" and that he made it difficult for her to perform her job. *Id*. at 83-84.

The events of the following day, November 2, 2005 -- Plaintiff's last day on the job -- are not substantially disputed. Plaintiff testified that, the day started out like a regular day except that she was not feeling well and, after she called her doctor, she called for relief at 10:30 to see if the afternoon dispatcher could come in before noon to take over for her. *Id*. at 88. She testified that shortly thereafter, Batchelder called her into his office and shut the door behind them. *Id*. at 89. Once they were in the office, Batchelder said, "I want to talk to you about what happened yesterday." *Id. See also* Batchelder Dep., p. 93-94. He then proceeded to tell Plaintiff that she had been unprofessional and "borderline rude" with the comments she made the day before. [Plaintiff's Dep., pp. 89-90; Batchelder Dep., pp. 93-94.] Batchelder testified,

> I told her she was unprofessional, out of line, and disrespectful to the fire chief and that she was not a doctor and she could not diagnose whether I had ADD or not and she had no business even making a statement like that, and it was not [professional], she crossed over boundaries. That was the terminology that I used. She stepped over boundaries.

*Id.*

According to Plaintiff, she responded saying, "I apologize, I am absolutely not a doctor and I do not know if you have ADD. However, I'm a mother and I know what it

looks like." [Plaintiff's Dep., p. 90.][8]  She then got up to go back to the dispatch radio and Batchelder followed her.  *Id.* at 91; Batchelder Dep., p. 94.  Batchelder ordered Plaintiff back into his office.  *Id.*; Plaintiff's Dep., pp. 91-92.  Once inside the office, before Batchelder could say anything, Plaintiff announced, "I've already called relief.  I'm going home sick," and got up and left.  *Id.* at 92; Batchelder Dep., p. 95.

Plaintiff then encountered the person sent to relieve her, Sergeant Robert Charette. Plaintiff told Charette she felt like she was going to throw up and asked him to check her blood pressure.  Plaintiff's Dep., p. 93.  Charette got a blood pressure cuff from one of the ambulances and took Plaintiff's blood pressure.  *Id.*  According to Plaintiff, her blood pressure was 150 over 100.  *Id.*  She then said to Charette that she had to leave.  *Id.* According to Plaintiff, Charette had gone into Batchelder's office and, then came out saying that "Batchelder wants you out now," so she picked up her purse and began to walk out of the station.  *Id.*

Batchelder came out of his office and followed Plaintiff out of the building.  *Id.* at 94; Batchelder Dep., p. 96.  According to Plaintiff, as she was going through the doors to exit the station, Batchelder grabbed her arm leaving a distinct finger impression, saying over and over, "Dodie, Dodie, Dodie."  *Id.*  (Batchelder denies touching Plaintiff. Batchelder Dep., p. 96.)  Plaintiff said she told him to "Get your hands off me" and

---

[8]  Batchelder's version of how Plaintiff responded to his remarks differs from that of Plaintiff.  According to Batchelder, Plaintiff responded by saying, "You'd better stop, chief, you better stop right now. . . . if you go any further I am going to file a sexual harassment complaint against you."  Batchelder Dep., p. 94.

walked to her car.  *Id.*  Batchelder followed her to her car.  According to Plaintiff, after she had gotten into her car and was reaching to pull the door shut, Batchelder angrily told her, "You can't come back until you call Hajkus [the human resources director]."  *Id.* at 95.  Batchelder admits following Plaintiff to her car and admits that he told Plaintiff that she was not to return to work until she set up a meeting with him and the human resource director. [Batchelder Dep., p. 96.] Plaintiff never returned to work after November 2, 2005.

Prior to leaving her job on November 2, 2005, Plaintiff did not report her allegations of sexual harassment by Batchelder to the Human Resources Department or the City Manager as specified in the City of Riverview's "Policy on Harassment in Employment".  *See* Defendant's Ex. 8; *see also* Affidavit of Human Resources Director John Hajkus at Defendant's Ex. 7.  The only time during the course of her employment that Plaintiff mentioned Batchelder to Hajkus was some time shortly after October 11th. [Plaintiff's Dep., p. 29.] Plaintiff testified that Hajkus had called her on a business question.  After she answered his question, Hajkus allegedly asked her how things were going with Batchelder.  *Id.*  According to Plaintiff, the only specific complaints about Batchelder that she told Hajkus about was that  "calls me every name but my own" and that he walked so closely behind her that she "can't stop fast or he'll go right up my ass." *Id.*  She added that she also told Hajkus that Batchelder "crosses personal and professional boundaries" but never explained what she meant by that -- in her opinion, "going over personal and professional boundaries should have been enough," -- nor did

she say anything about Batchelder hugging her or making any inappropriate comments. *Id*. at 30-31.

The day after she left her job, on November 3, 2005, Plaintiff sent a note to Human Resources Director Hajkus enclosing her doctor's note for a month-long stress leave beginning November 3rd, along with a request to "please furnish me with the proper paperwork to file a harrassment [sic] complaint." *See* Defendant's Ex. 6. Plaintiff did not describe any specific allegations of harassment and did not indicate that the harassment she intended to file a complaint about was "sexual" in nature. *Id. See also* Hajkus Aff., ¶ 6. Plaintiff testified that she was aware of the City's sexual harassment policy because one of her female co-workers had filed a sexual harassment claim against Fire Marshal Timothy Bosman. [Plaintiff's Dep., pp. 45-46.] She also attended "Harassment/Discrimination in the Workplace" training sessions. *See* Defendant's Ex. 21.

Hajkus complied with Plaintiff's request and sent her an "Employee Harassment Complaint Form" on November 4th. *See* Defendant's Ex. 6; *see also* Hajkus Aff., ¶ 6.

On November 7, 2005, Plaintiff met with Hajkus and asked him for a copy of her personnel file. *See* Defendant's Ex. 7(A); *see also* Plaintiff's Ex.9. Hajkus advised Plaintiff that if she was claiming that her stress leave was work-related, as her doctor's note indicated, she would have to go to the Concentra clinic that Riverview used for workers' compensation matters. Hajkus Aff., ¶ 7 and Affidavit Ex. A; Plaintiff's Dep., pp. 108-109. Plaintiff also acknowledged in that November 7 meeting that she had

received the harassment complaint forms in the mail but had not completed them. Hajkus Aff., ¶ 7. Hajkus reminded Plaintiff that she was still a City employee and that she had not submitted a resignation notice. *Id.*

Plaintiff testified that following this November 7 meeting, she only had one additional conversation with Hajkus before she submitted her Harassment Complaint Form. She testified that Hajkus telephoned her some time after their November 7 meeting and suggested that she sign up for leave under the Family Medical Leave Act. [Plaintiff's Dep., p. 121.] She testified that she responded, "Why would I do this? This is a workman's comp sexual harassment situation. I'm not going on a family leave." *Id.*

Seven weeks later, on December 20, 2005, Plaintiff finally returned her completed Harassment Complaint Form. *See* Defendant's Ex. 9.[9]

Upon receipt of Plaintiff's complaint, Hajkus began an investigation and interviewed Chief Batchelder, Ms. Hensman, and other Fire Department staff. *See*

---

[9] Plaintiff attached to the Complaint Form two typewritten pages outlining her account of Batchelder's "inappropriate and unprofessional actions" towards her. *See* Defendant's Ex. 9. In this narrative, Plaintiff complained about the three hugs by Batchelder; his comment about her beautiful eyes; the 11:30 visit by Batchelder to her house to get her office key and his comment about how sweet she looked in her pajamas with her hair all messy; his bringing her flowers and bagels to apologize the next day; her meeting with Batchelder on November 1; and his chastising her the next day, November 2, when he told her she had been unprofessional and borderline rude the previous day, and his following her out of the fire station telling her she was not to return to work until she scheduled a meeting with him and the human resources director. She also complained about Batchelder's lack of understanding of the budget or payroll accounts and her having to do his job for him. Plaintiff did not mention Batchelder's alleged "voluptuous" description of her or his large-breasts hand gesture.

Hajkus Aff., ¶¶ 9-10 and Affidavit Exhibits B and C.  Hajkus determined that there was

no evidence of sexual harassment under the City Policy,[10] and on January 20, 2006, sent

Plaintiff by certified mail, a Memorandum setting forth his findings.  *Id.*  Plaintiff never

requested a meeting with Hajkus after that date.  Hajkus Aff., ¶ 11.

Meanwhile, on November 22, 2005, Plaintiff filed a workers' compensation claim

alleging a September 12, 2005 date of injury for  "job-related stress, vertigo,

hypertension, neck and back pain."  *See* Plaintiff's Supplemental Brief, Ex. 1. On the eve

of the worker's compensation hearing, Plaintiff amended her claim to proceed only on the

psychiatric (job-related stress) claim with November 2, 2005 as the date of disability.  *Id.*

After a hearing on the claim, Workers' Compensation Magistrate Joy Turner concluded

that Plaintiff had made out a claim for workers' disability compensation benefits and

ordered that she be paid $254.58 per week, retroactively from November 2, 2005 through

August 13, 2007 and, continuing week to week until further order of the Workers'

---

[10]  Riverview's Harassment in Employment Policy states as follows:

It is the policy of the City of Riverview that discriminatory treatment based
on race. . . sex (with or without sexual conduct). . . will not be tolerated.  In
keeping with this policy, the City of Riverview will not tolerate harassment
of any employee or applicant based on any of the foregoing classifications
by any of it employees, supervisors, elected officials, clients, customers or
vendors.  This policy does not prohibit simple teasing, offhand comments,
or isolated incidents that are not extremely serious.  The conduct prohibited
by this policy must be sufficiently frequent or severe to create a hostile
work environment or result in a tangible employment action such as but not
limited to hiring, firing, promotion or demotion.

Defendant's Ex. 8, p. 1.

Compensation Agency. *Id.*[11] The City of Riverview has appealed the Magistrate's

decision. *See* Defendant's Response to Plaintiff's Supplemental Brief.

On March 16, 2006, Plaintiff filed an EEOC complaint and obtained a right to sue

letter. On October 20, 2006, Plaintiff initiated the instant action. Plaintiff's original

Complaint alleged Title VII hostile work environment and assault and battery claims

against the City of Riverview and Richard Batchelder. By stipulation, Plaintiff

subsequently amended her Complaint, removing the assault and battery claim, adding a

sexual harassment/hostile work environment claim under the Michigan Elliott-Larsen

Civil Rights Act, and dismissing Richard Batchelder as a party-defendant. Then, after the

close of discovery, the City of Riverview filed the instant Motion for Summary Judgment.

### III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

[11] The Magistrate found that Plaintiff had a pre-existing psychiatric condition (depression) attributed to a 1998 car accident she had been was involved in, that was "contributed to, or aggravated or accelerated" by the same employment-related events she complains of in this action. [*See* Plaintiff's Supplemental Brief, Ex. 1.] However, while the Magistrate found Plaintiff to have established that her work "contributed to her psychiatric condition in a significant manner," she emphasized, "I do not make a finding of sexual harassment." *See id.*, p. 19. In any event, even if she had made such a finding, a workers' compensation magistrate's finding that a plaintiff suffered a work-related disability based on alleged sexual harassment in the workplace does not estop the former employer from disputing liability in a sexual harassment action because the issues in the latter action are different. *See Horn v. Department of Corrections*, 216 Mich. App. 58, 62-63, 548 N.W.2d 660 (1996).

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[12]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

---

[12]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure</u>, § 2727, at 35 (1996 Supp.).

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

B.      PLAINTIFF HAS FAILED TO MAKE OUT A SEXUALLY HOSTILE WORK ENVIRONMENT CLAIM UNDER FEDERAL OR STATE LAW

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his[/her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir.1997), *cert. denied*, 522 U.S. 865 (1997).

The "based on sex" requirement of a Title VII hostile work environment claim includes sexually related remarks and conduct, as well as non-sexual conduct "where it evinces anti-female animus." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (co-worker's comment that he was "sick and tired of these fucking women," held to contribute to a sexually hostile environment). The bottom line in a sexual harassment case, however, is that the plaintiff must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discriminat[ion] ... because of ... sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998) (internal citations and punctuation omitted).

Sex discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). In determining whether discriminatory conduct is sufficiently "severe or pervasive" to create a hostile work environment, the *Harris* Court directed the lower courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23, 114 S.Ct. at 371.

However, not all conduct that has sexual overtones is forbidden under Title VII.

*Meritor*, 477 U.S. at 67. The alleged harassment must affect a "term, condition, or privilege" of the employment. *Id*. As the *Harris* Court explained, the "mere utterance of an . . . epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment to implicate Title VII." 510 U.S. at 21. Further, the "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir.1999) (quoting *Black v. Zaring Homes, Inc*., *supra*).

To determine whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances. *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000).

> The issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile work environment case, but whether -- taken together -- the reported incidents make out such a case. The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.

*Bowman* at 463. (Citations and internal punctuation omitted.)

Michigan law is similar. The Michigan Elliott-Larsen Civil Rights Act broadly defines sexual discrimination as including sexual harassment, and includes within its definition of sexual harassment, conduct which creates a hostile work environment:

Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

* * *

> (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive . . . environment.

M.C.L. § 37.2103(h).[13]

The Michigan Supreme Court has determined that an objective reasonableness standard must be utilized to determine whether a hostile work environment exists under the Michigan Elliott-Larsen Act. *Radtke v. Everett*, 442 Mich. 368, 398, 501 N.W.2d 155, 169 (1993). Thus, as with Title VII, a sexually hostile work environment claim under Michigan law is actionable "only when, in the totality of circumstances, the work is so tainted by sexual harassment that a reasonable person would have understood that the defendant's conduct or communication had either the purpose or effect of substantially

_____

[13] The Michigan Act differs from Title VII in one respect: Whereas the "based on sex" requirement of a Title VII hostile work environment claim includes sexually-related remarks and conduct, as well as non-sexual conduct "where it evinces anti-female animus," *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999), a sexual harassment hostile work environment claim under the Elliott-Larsen Act does not. Where there are no "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct or communication *of a sexual nature*," the plaintiff fails to make out a claim of sexual harassment under the Elliott-Larsen Act. *Haynie v. State of Michigan*, 468 Mich. 302, 313-14, 662 N.W.2d 129, 135-36 (2003) (overruling *Koester v. Novi*, 458 Mich. 1, 580 N.W.2d 835 (1998)). In *Corley v. Detroit Bd. of Educ.*, 470 Mich. 274, 681 N.W.2d 342 (2004), the Michigan Supreme Court determined that conduct or communication "of a sexual nature" must involve circumstances that "inherently" pertain to sex. *Id.* at 279-80; 681 N.W.2d at 345-46.

interfering with the plaintiff's employment, or subjecting the plaintiff to an intimidating, hostile, or offensive work environment." *Id.*[14]  To satisfy this requirement, it is generally accepted that the plaintiff must establish that the complained of sexual harassment was "severe" or "pervasive." *Dix v. Siemens Information Systems, Inc.,* 82 F.3d 417, 1996 WL 156695 (6th Cir. 1996) (applying Michigan law).

To make out a *prima facie* claim of a sexually hostile work environment under Title VII, a plaintiff must allege and demonstrate (1) that she was a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her sex; (4) that the harassment had the effect of unreasonably interfering with Plaintiff's work performance and was sufficiently severe or pervasive to create a hostile or offensive working environment; and (5) that the employer

---

[14]  As the Michigan Supreme Court explained in *Radtke*,

[A] reasonableness inquiry is necessary to fulfill the purpose of the [Michigan Civil Rights] act.  As noted, the purpose of the act is to combat serious demeaning and degrading conduct based on sex in the workplace, and to allow women the opportunity to fairly compete in the marketplace.  The reasonableness inquiry, (i.e., objectively examining the totality of the circumstances) in a hostile work environment action, is simply a method of objectively determining whether a hostile work environment existed.  **The alternative would be to accept all plaintiffs' subjective evaluations of conduct, thereby imposing upon employers liability for behavior that, for idiosyncratic reasons, is offensive to an employee.  We believe that such a result is contrary to both the plain meaning of the statute, as well as the statute's overall purpose. [Citation omitted.]  To hold the contrary would delimit the act and ensure a deluge of unwarranted litigation in contravention of the act's purpose.**

442 Mich. at 387, 501 N.W.2d at 164 (emphasis added).

knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. *See Fenton v. HiSAN, Inc.,* 174 F.3d 827, 829-30 (6th Cir. 1999).[15]

Turning to the instant action, and viewing the facts in a light most favorable to Plaintiff, the Court finds that the evidence is insufficient to support a finding that the comments and conduct complained of were severe or pervasive enough to create an objectively hostile work environment under Title VII or Michigan law.

The first level of analysis requires determining whether any of the conduct complained of was "sexual" in nature or evinced "anti-female animus" so as to satisfy the "based on sex" requirements of the federal and state statutes. As the Supreme Court held in *Oncale v. Sundowner Offshore Services, supra*, "The prohibition of harassment on the basis of sex requires neither asexuality nor androgeny in the workplace. . . .  We have

---

[15] The same elements are required to make out a *prima facie* claim under the Michigan Elliott-Larsen Act. Under the Michigan Act, it must be shown that:

(1) the employee belonged to a protected group;
(2) the employee was subjected to communication or conduct on the basis of sex;
(3) the employee was subjected to unwelcome sexual conduct or communication;
(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment;  and
(5) respondeat superior.

*Chambers v. Trettco,* Inc., 463 Mich. 297, 311, 614 N.W.2d 910, 915 (2000) (quoting, *Radtke v. Everett*, 442 Mich. 368, 382-3,  501 N.W.2d 155, 162 (1993)).

22

always regarded [the severe and pervasive sexual conduct] requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace -- such as male-on-male horseplay or intersexual flirtation -- for discriminatory 'conditions of employment.'" 523 U.S. at 80, 118 S.Ct, at 1003.

Here, as indicated, Plaintiff admits that Chief Batchelder never asked her out on a date, never propositioned her, never demanded any sexual favors of her and never sexually groped or fondled her. Further, there is no evidence of sexually inappropriate jokes or sexist comments nor any evidence of anti-female animus. Plaintiff's only complaints are that Batchelder (1) called her by the wrong name; (2) kept the door closed when he met with her in his office; (3) walked too closely behind her; (4) would sniff and ask what fragrance she was wearing; (5) commented about noticing her blue eyes; (6) told her she looked "cute in her jammies" when, after locking himself out of the office after an evening meeting, came to her house at night to get her key, and brought her flowers and bagels the next day to apologize for waking her up; (8) twice told her she was strong, aggressive, and "voluptuous" like his wife and mother-in-law; (9) made a gesture of large breasts when he said the word "voluptuous"; (10) hugged her on three occasions; and (11) grabbed her by the arm when she was storming out of the fire station on her last day on the job.

There is nothing inherently sexual or anti-female about calling someone by the wrong name, keeping an office door closed while meeting with a subordinate, walking

too closely behind someone, sniffing and asking what fragrance someone was wearing, noticing someone's eyes or telling someone that she looked cute in what she is wearing, or in bringing someone flowers and bagels to apologize for disturbing her the previous evening. Such allegations of non-sexual "harassment" are insufficient to sustain a sexually hostile work environment claim. *See Schemansky v. California Pizza Kitchen, supra*, 122 F. Supp. 2d at 774-775. The only comments which may be classified as "sexual" are Batchelder's two remarks that Plaintiff was a "voluptuous" woman, accompanied by a hand-gesture indicating large breasts.

As for physical conduct, as indicated, there is no evidence of any sexual touching or groping. The only physical contact Plaintiff complains of is being hugged three times by Chief Batchelder, and his having grabbed by her by the arm while she was exiting the fire station her last day on the job. As Plaintiff admits, two of the hugging incidents were accompanied by work-related comments made by Batchelder indicating his appreciation for her assistance with his job, and the last hug, as admitted by Batchelder, was to calm Plaintiff down because she was upset. Plaintiff did not describe any of the hugs -- or the one instance on her last day of work when Batchelder allegedly grabbed her by the arm -- as sexually suggestive in any way.[16] But even if these four isolated instances of physical contact and the two alleged "voluptuous" comments/gestures are viewed as being of a

---

[16] Furthermore, Plaintiff herself hugged various men in the department without complaint. As the court noted in *Duggins v. Steak 'n' Shake*, 3 Fed. Appx. 302, 312 (6th Cir. 2001), a hostile work environment plaintiff cannot reasonably argue that conduct was subjectively offensive to her if she herself engaged in such conduct.

sexual nature, only conduct that is both "because of sex" and severe and pervasive can be considered in the hostile work environment analysis. *See e.g., Bowman, supra* (finding that much of the conduct complained of by plaintiff was not because of his sex and the conduct that was sex-based was not severe or pervasive).

As indicated, in evaluating the totality of the circumstances, the Court is to consider such factors as the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. *See Harris, supra*; *Williams v. General Motors, supra*. "It is only when the workplace is 'permeated' with discriminatory intimidation and insult that the Civil Rights laws are implicated." *Schemansky v. California Pizza Kitchen*, 122 F. Supp. 2d 761, 777 (E.D. Mich. 2000).

In *Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (6th Cir. 2005), the Sixth Circuit found that the plaintiff failed to make a *prima facie* showing of a hostile work environment where she alleged only a few relatively isolated incidents over a period of approximately two and a half years in which her supervisor twice placed his vibrating pager on her thigh as he passed her in the hall, pulled at her overalls after she told him she was wearing a thong, and frequently told vulgar jokes. *Id.* at 351. The court noted that "[w]hile there is no bright line rule as to what constitutes a hostile work environment, plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive

situation." *Id.* In *Clark* the plaintiff did not meet this standard. The court explained,

> Although [plaintiff's] allegations of harassment by Brock could certainly be construed as offensive, they are simply not substantial enough to satisfy the prima facie showing. Her claims depict isolated instances rather than an ongoing situation. Appellants retort that the harassment of [plaintiff] was much more pervasive, relying on the fact that she had to listen to Brock tell the employees nasty jokes at least once a month. However the jokes that Brock told in [plaintiff's] presence are not enough to elevate the isolated incidents to an ongoing and pervasive hostile environment.

*Id.* at 352.

In *Black v. Zaring Homes*, *supra*, the Sixth Circuit reversed a jury verdict that had been entered in favor of the plaintiff on a Title VII sexually hostile work environment claim. The court found that although various comments made repeatedly by plaintiff's male co-workers in her presence at bi-weekly staff meetings for a period of more than three months were "sex-based," there was insufficient evidence to support a finding that they were severe or pervasive enough to create a hostile work environment. *Id.* at 826. The court explained, "Although the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was not designed to purge the workplace of vulgarity." *Id.* (Citation omitted.)

Similarly, in *Dix v. Siemens Information Systems, Inc., supra*, the court affirmed a grant of summary judgment in favor of the defendant-employer on an Elliott-Larsen hostile work environment claim finding that the plaintiff's evidence that during her five years at Siemens she had to put up two clearly sexist comments and occasional

non-sexual, non-sexist vulgarities was insufficient to establish a *prima facie* claim of the existence of a sexually hostile work environment.

In *Shaull v. Michigan Affiliated Health Care System*, 1998 WL 1989810 (Mich. App. 1998), the court found that hugging plaintiff from behind, kissing the back of plaintiff's head and calling her "hon," telling the plaintiff to cross her legs "like a man" while wearing a skirt, and asking personal questions about plaintiff's sexual relationship with her husband, was not severe or pervasive enough conduct to constitute sexual harassment based on a hostile work environment.

As suggested by the foregoing cases, Plaintiff's allegations of four instances of physical touching and two sexual comments/gestures do not amount to "severe or pervasive" sexually harassing conduct. Indeed, courts have found conduct far more egregious than that complained of by Plaintiff not to establish a sexually hostile work environment.

For example, in *Burnett v. Tyco, Corp.,* 203 F.3d 980, 981 (6th Cir. 2000), *cert. denied*, 531 U.S. 928 (2000), the Sixth Circuit found that three instances of alleged sexual harassment -- plaintiff's supervisor's placing of a pack of cigarettes and a lighter inside plaintiff's tank top and brassiere, his comment, "Since you have lost your cherry, here's one [a cherry cough drop] to replace the one you lost," and his singing to her, "Dick the malls, dick the malls, I almost got aroused" -- over a five-month period to be insufficient to support a hostile work environment claim. In *Stacey v. Shoney's Inc.*,

1998 WL 165139 (6th Cir. 1998), the court determined that a hostile work environment was not shown where, over a two-month period, a male supervisor continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house. Likewise, in *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000), the court found that an employer's alleged request for sexual favors in exchange for a better evaluation, combined with calling the plaintiff "hot lips," commenting on her dress and telling dirty jokes did not create a hostile work environment as a matter of law. *See also, Myers v. Todd's Hydroseeding & Landscape,* 368 F. Supp. 2d 808 (E.D. Mich. 2005), in which the court found the following allegations insufficiently severe or pervasive to support a claim of hostile work environment: (1) references to "big boobs," "panty lines," and "G-strings" in sexual statements or jokes; (2) references to the size of genitals as part of sexual joke; (3) touching of plaintiff on her shoulders; (4) comments by a manager that plaintiff has aged well, was pretty, and had a nice figure; (5) the manager's directions to plaintiff to call him from home and to take a call in the conference room instead of at her desk; (6) the manager's massaging of the shoulders of a another female employee in plaintiff's presence; and (7) the manager asking the female employee to come to his house when his girlfriend was away.

By application of the foregoing authorities, it is clear that Plaintiff here has failed

to establish that she was subjected to severe and pervasive harassment because of her sex. At best, Plaintiff has presented evidence of two arguably sexual comments and a few isolated incidents which Plaintiff subjectively deemed to be inappropriate and offensive conduct on the part of Chief Batchelder that cannot be fairly and reasonably characterized as being directed against Plaintiff "because of her sex."

## CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Leave to File a Supplemental Brief [Dkt. # 27] is GRANTED.

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Dkt. # 21] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Amended Complaint is DISMISSED, with prejudice. Let Judgment be entered accordingly.


s/Gerald E. Rosen_____
Gerald E. Rosen
United States District Judge

Dated: March 26, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 26, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry_____
Case Manager